IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 3, 2023

FILED
02/27/2024
Clerk of the
Appellate Courts

**STATE OF TENNESSEE v. DARUNN TURNER**

**Appeal from the Criminal Court for Shelby County**
**No. C1906849, 19-04890   James M. Lammey, Judge**

_____

**No. W2022-01389-CCA-R3-CD**

_____

The Appellant appeals his convictions of voluntary manslaughter, reckless endangerment with a deadly weapon, and possession of a handgun by a convicted felon for which he received an effective sentence of twenty-seven years' confinement.  On appeal, the Appellant contends that: (1) the evidence is insufficient to support his convictions; and (2) the trial court abused its discretion by imposing the maximum within-range sentences and ordering that they be served consecutively.  Though he also challenges the trial court's failure to include reckless homicide as a lesser included offense of first degree murder and the allegedly inconsistent verdicts, he has waived these issues by failing to file a motion for new trial.  After review of the preserved issues, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which J. ROSS DYER, J., joined.  ROBERT H. MONTGOMERY, JR., J., filed a separate concurring opinion.

Shae Atkinson, Memphis, Tennessee (on appeal) and Handel Durham and Ken Margolis, Memphis, Tennessee (at trial) for the appellant, Darunn Turner.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Steve Mulroy, District Attorney General; and Greg Gilbert and Justin Prescot, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**

This case stems from a May 10, 2019 altercation during which the Appellant fired at least eight shots toward the home where his children and their mother[1] lived. After the Appellant dropped his son D.T. off at the home, D.T. claimed the Appellant choked him because he lost the Appellant's chain necklace. Two individuals at the home whom the Appellant did not know confronted the Appellant and punched him. The Appellant drove away, returned a few minutes later, and opened fire. The mother was struck in the leg and the victim, Marcus Powells, was struck three times and killed. The Appellant fled to his home in Arkansas before turning himself in three days later. A Shelby County grand jury indicted the Appellant for the first degree murder of Powells, attempted first degree murder of the mother, reckless endangerment with a deadly weapon of K.A., employing a firearm during the commission of a dangerous felony, possession of a handgun by a convicted felon, and domestic assault of D.T.

**Trial**. At trial, eight witnesses testified for the State, and the Appellant testified in his defense. The proof relevant to the issues raised in this appeal is summarized below. Officer Robert Collins of the Memphis Police Department testified that he responded to a report of shots fired at a home on North Frayser Circle. When he arrived, the family was "visibly upset" and said someone had been shot. He located the wounded individual, later identified as Powells, in the backseat of a car in the driveway. Officer Collins pulled Powells from the car and, after finding no pulse, began to perform CPR. After paramedics arrived, Officer Collins observed five or six shell casings lying in front of the driveway. His body camera footage was played for the jury and entered into evidence. According to the time stamp on the footage, Officer Collins responded to the scene at 2:06 a.m.

The mother of the minor victims testified that the Appellant was the father of three of her children—S.A., D.A., and D.T. Around 8:00 p.m. on May 10, 2019, the Appellant came to her home unexpectedly. She walked toward the Appellant's truck, and he told her he was there "to take the kids out to eat." She told him that she was cooking dinner, and it would be ready in thirty minutes. The Appellant left. Afterwards, the mother realized that D.T., who was fourteen years old at the time, had left with the Appellant. About fifteen minutes later, she heard banging at her front door and opened it to find D.T. crying. D.T. told her the Appellant choked him. The mother brought D.T. inside the house and attempted to calm him down. Two of her other children, S.A. and K.A., were in the house along with their friends Powells, "Eric," and "George."[2]

---

[1] It is the policy of this court to refer to minor victims and related individuals by their initials. Because the mother and one of the minor victims share the same initials, we will refer to the mother as "the mother."

[2] Because no last names have been provided in the record, we will refer to Eric and George by their first names.

The mother said Powells and Eric went outside. After calming D.T. down, the mother walked toward the kitchen, looked through the glass front door, and saw the Appellant's truck "pull up again." The Appellant parked parallel to the curb in front of the house, blocking the driveway. The mother "[saw] Eric punch [the Appellant] in the face" and run away. The Appellant drove away, but returned three or four minutes later. The mother walked outside onto the porch and one of her sons, K.A., stood in the doorway behind her. Powells was still in the driveway.

The mother said she saw the Appellant fire two shots toward her before he "just [started] rounding off." K.A. ran to the back room as soon as the shots were fired. S.A., who had been in her bedroom, saw that the mother was bleeding and pulled her inside the home. The mother had been shot in her right leg, approximately six inches above her ankle. The Appellant drove away after he fired the shots. Shortly after, the mother and the others went outside and saw Powells lying on the ground in the driveway next to the mother's car. Those present tried "to give him mouth to mouth resuscitation" and keep him conscious. They called 911, but had difficulty "getting through." Paramedics arrived approximately fifteen minutes after the shots were fired. Photographs showing a beam on the home's front porch grazed by a bullet, a bullet in the front door frame, and blood on the floor of the door frame were entered into evidence.

On cross-examination, the mother said the shooting occurred between 8:00 p.m. and 9:00 p.m., not 2:00 a.m. as indicated by the body camera footage. She said two days after the shooting Eric told her he punched the Appellant because the Appellant was reaching under his seat and Eric feared he was reaching for a gun. She acknowledged, however, that she never relayed Eric's statement to the police. She clarified that the Appellant drove away after dropping D.T. off. When Powells and Eric went outside, the Appellant "circled back around" and "that's when Eric [] hit [the Appellant]." The Appellant then drove away again, returned a few minutes later, and fired the shots. The mother acknowledged that she was not watching Eric the entire time he was outside.

D.T. testified that while at band practice on May 10, 2019, he lost a chain necklace the Appellant had given him. As it was getting dark that night, the Appellant came to his house and asked him if he wanted to go to Taco Bell. D.T. left with the Appellant. In the Taco Bell parking lot, the Appellant asked D.T. where the chain necklace was. D.T. told the Appellant he lost it at school, so the Appellant drove him there to look for it. After arriving at the school, the Appellant put his arm around D.T.'s neck and began to "jerk[] [him] around." Because it was dark outside, they were unable to find the chain necklace. D.T. said the Appellant then put his hand around D.T.'s neck, which hurt. D.T. pushed the Appellant off of him. The Appellant grabbed D.T. by the back of his shirt and pulled him back toward the truck. Upon returning home, D.T. was crying and struggled to share what happened. Eric, K.A., and Powells went outside to see what happened. Eric went up to

- 3 -

the Appellant's truck, but D.T. did not see what happened. D.T. went downstairs to change shoes. About a minute later, D.T. heard approximately fourteen gunshots and returned upstairs to find the mother bleeding and "hopping around." Powells was outside and had been shot. S.A., K.A., Eric, and Tristan Siggers were also at the home.

S.A., who was seventeen when the shooting occurred, testified that the Appellant was supposed to come to her house to give her money to get her hair done. Though they were supposed to meet after school, she did not get home until 8:15 or 8:30 p.m. When she got home, the mother, Eric, Powells, and another person whose name she did not remember were in the home. D.T. had already left with the Appellant. After S.A. went to her bedroom, she heard her brother D.T. "[storm] in" and say the Appellant had choked him. S.A. then heard the mother and the Appellant arguing. S.A. remained in her room, too nervous to leave. Everyone came back inside the home upset, and she heard Eric say that the Appellant was gone. The Appellant returned, and everyone else went outside. S.A. heard "a lot of commotion," followed by gunshots.

S.A. approached the front of the home and saw the mother "limping" and bleeding. She told the mother to sit down, and S.A. ran outside. She saw Powells lying on the sidewalk near the driveway. She called 911 more than three times but had trouble "getting through." They moved Powells into the back seat of the mother's car in the driveway to take him and the mother to the hospital. As they were about to leave, the ambulance arrived. On cross-examination, S.A. clarified that when D.T. came home, Eric went outside but she was unsure if any of the others went with him. She did not witness any altercation between Eric and the Appellant.

Officer Eric Moore responded to the scene at 11:50 p.m. and took photographs of the evidence found outside the home—eight 9mm spent shell casings, a bullet fragment, damage to the front porch, and blood and clothing on the driveway. Based on the location of the shell casings, the Appellant was near the end of the driveway when he fired the shots. On cross-examination, Officer Moore agreed that he could not determine whether the bullet fragment came from the recovered shell casings.

Kasia Lynch of the Tennessee Bureau of Investigation testified that the eight shell casings collected from the scene were all fired from the same 9mm Luger pistol. On cross-examination, Agent Lynch acknowledged the possibility that another firearm, one that does not eject shell casings when fired, was also involved in the incident.

Doctor Katrina Van Pelt, a forensic pathologist, testified that she performed the autopsy on Powells. Her autopsy report indicated that Powells' death was a homicide caused by multiple gunshot wounds. Powells was shot three times—once in the left side of his back, once in the right side of his chest, and once in his right leg. On cross-

examination, Dr. Van Pelt confirmed there were small abrasions on the back of Powells' hands. The abrasions could have been caused by many things, including striking another person or falling after he was shot. Dr. Van Pelt also confirmed the presence of alcohol, THC, and methamphetamine in the victim's blood. She agreed that methamphetamine is capable of causing hallucinations, aggressive behavior, and irrational reactions. Before the State closed its proof, the parties stipulated that the Appellant had been previously convicted of a felony.

The State rested, and the Appellant testified as the sole witness for the defense. He said he got to the house around 8:00 p.m. to give his daughter S.A. money to get her hair done. When D.T. came outside to greet him, the Appellant noticed D.T. was not wearing the chain necklace he recently gave him. D.T. told the Appellant he lost it at school, so he drove D.T. to the school to look for it. After they arrived at the school, D.T. admitted that he had actually sold the chain necklace to purchase marijuana. The Appellant said he told D.T. he "could have told him that," and that they could have "talked about [it]" and "took it in a different way." The Appellant then drove D.T. back to the house where they sat parked on the street in front of the driveway while the Appellant lectured D.T. The Appellant received a call from a friend and told D.T. to go inside and they would "continue the conversation some other time[.]" The Appellant also told D.T. to tell S.A. to come outside. D.T. slammed the car door and ran inside the house.

As the Appellant was waiting in his truck for S.A., he saw three shadows coming out of the house. Two men he did not know approached his truck. One of the men "pulled [his] hair and [] had [his] head cocked over [his] door" while the other man was "beating [him] in [his] face." The Appellant "blanked out" during this attack, and by the time he realized what was happening, he was "constantly getting hit." He "was terrified and afraid" and "just react[ed]." He grabbed the 9mm gun in his console and fired toward the driveway approximately eight times. He left immediately after firing the shots because he heard someone returning fire while he was shooting. He returned to his home in Arkansas, but turned himself in after learning that the police were looking for him. The Appellant said his truck had been struck by bullets, but the truck was not taken into police custody and had since been repossessed.

On cross-examination, the Appellant admitted that he "dump[ed]" the gun when he got back to Arkansas. He agreed that his attackers ran away when he grabbed his gun. He also agreed that he did not turn himself in until three days after the shooting, despite learning on the night of the shooting that the police were looking for him. He claimed he did take photographs of the bullet holes in his truck, but he no longer had them.

The jury convicted the Appellant of the lesser included offense of voluntary manslaughter of Powells and convicted him as charged of reckless endangerment with a

- 5 -

deadly weapon of K.A. and possession of a handgun by a convicted felon. The jury acquitted the Appellant of attempted first degree murder of the mother, employing a firearm during the commission of a dangerous felony, and domestic assault of D.T.

**Sentencing Hearing**. The trial court conducted a sentencing hearing on March 29, 2022 and imposed an effective sentence of twenty-seven years' confinement. The proof relevant to the issues raised in this appeal is summarized below. Two witnesses testified for the State, two witnesses testified for the defense, and the Appellant provided an allocution statement. The pre-sentence report and certified copies of the Appellant's Arkansas convictions were entered into evidence. The Appellant had five prior felony convictions and eight prior misdemeanor convictions. In 2001, the Appellant was convicted of battery in the second degree in Arkansas, a felony which according to the Arkansas sentencing report resulted in "severe trauma to [the] head area of [the] victim." See Ark. Code Ann. § 5-13-202.

Tyjuan Stitt, Powells' father, and Arzetta Stitt, Powells' mother, testified to the difficulties they have faced since the victim's death. Naya Dawson, the Appellant's cousin, and Frank Turner, the Appellant's uncle, testified to the Appellant's good character. They claimed that the Appellant had gotten "back on track" since he was released from prison. The Appellant provided an allocution statement and said he was "truly, truly sorry." He "didn't go over to [his] kid's mother's house with [the] intention [of] doing this." He was "in a situation where [he] was forced[,]" and he wished he had a chance to talk things out with the victim instead.

After hearing this testimony, the trial court sentenced the Appellant as a Range III offender to fifteen years for voluntary manslaughter, six years for reckless endangerment, and six years for possession of a handgun as a convicted felon. The trial court applied enhancement factors (1), (3), (8), (10), (11), and (12) to each of the Appellant's convictions. See Tenn. Code Ann. § 40-35-114. The court also applied enhancement factor (9) to the Appellant's voluntary manslaughter conviction. Id. The court assigned little weight to the Appellant's apology and found no mitigating factors.

In determining the appropriate sentence, the trial court repeatedly expressed its disagreement with the jury's verdict. The following statements reflect the court's disagreement:

> The jury gave [the Appellant] a tremendous gift. He will see the light of day one day. [He was] facing life with parole with another [fifteen] to [twenty-five] years on top of that for criminal attempt first degree murder. So[,] whatever he gets here is still a gift, really. But I believe he was guilty of first degree murder and I believe that he was guilty of criminal attempt first degree

- 6 -

murder[,] or at least second degree murder and criminal attempt second degree murder.

The court said that other than the seemingly inaccurate time stamp on the body camera footage, "there was no other weakness in this case" and it "[could not] explain the juror's verdict" and was "trying to reconcile that." The court also expressed its opinion that the State incorrectly indicted the Appellant for possession of a handgun by a convicted felon, a Class E felony, rather than possession of a firearm by a person convicted of a felony crime of violence, a Class B felony. See Tenn. Code Ann. § 39-17-1307(b)(1)(A), (c)(1).

The court ordered that the Appellant serve his sentences consecutively, for an effective sentence of twenty-seven years at forty-five percent. The court found that the Appellant was a dangerous offender, stating:

> I think just by looking at the facts of this case alone, . . . it could be argued with tremendous accuracy that Mr. Turner is a dangerous offender. Not only that, he has a prior conviction that's of a violent nature, a felony as well. But [] just from the facts of this case alone, it's evident that he is a dangerous offender. And because of that – I mean, he endangered other people's lives. He attempted to kill other people. He fled the scene. He was a convicted felon. [He] [s]houldn't have had a handgun there to begin with. Then[,] I don't believe he was truthful when he testified. All that, I think, adds up to the fact that this should be consecutive[.]

Despite discussing the deadline for a motion for new trial at the conclusion of the hearing, no motion for new trial was ever filed. Six months after the sentencing hearing, the Appellant late-filed a notice of appeal and asked that this court waive the timely filing requirement. In the interest of justice, this court granted the Appellant's motion. This case is now properly before this court for review.

## ANALYSIS

On appeal, the Appellant argues that: (1) the evidence is insufficient to support his convictions; (2) the trial court abused its discretion by imposing the maximum within-range sentences and ordering that they be served consecutively; (3) the trial court erred by failing to instruct the jury on reckless homicide as a lesser included offense of first degree murder; and (4) he is entitled to a new trial based on inconsistent verdicts. Because the Appellant did not file a motion for new trial, however, he has waived issues three and four. See Tenn. R. App. P. 3(e); State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) ("If a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing."). Though it is within this court's discretion to address waived errors under

the plain error doctrine, we decline to exercise such discretion in this case. See Tenn. R. App. P. 36(b); State v. Minor, 546 S.W.3d 59, 66 (Tenn. 2018) (highlighting that an appellate court's authority under the plain error doctrine should be exercised "sparingly"). The Appellant, despite acknowledging no motion for new trial was filed, failed to request plain error relief in his principal brief. Accordingly, we will limit our review to the sufficiency of the evidence and sentencing.

**I. Sufficiency of the Evidence**. The Appellant argues that the evidence is insufficient to support his convictions because the State failed to prove he did not act in self-defense. The State responds, and we agree, that a rational jury could have rejected the Appellant's self-defense claim and found the essential elements of the crimes beyond a reasonable doubt.

When evaluating the sufficiency of the evidence, this court must determine "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Because a guilty verdict removes the presumption of innocence and imposes a presumption of guilt, the Appellant bears the burden of showing why the evidence is insufficient to support the verdict. Id. (citing State v. Rice, 184 S.W.3d 646, 661 (Tenn. 2006)). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). The jury evaluates the credibility of witnesses, determines the weight given to witnesses' testimony, and reconciles all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The jury convicted the Appellant of voluntary manslaughter of Powells, reckless endangerment of K.A., and possession of a handgun by a convicted felon. Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (1990). Reckless endangerment, as charged in this case, occurs when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" and commits the offense "with a deadly weapon." Id. § 39-13-103(a), (b)(2) (2019). It is also an offense for a person who has been convicted of a felony to possess a handgun. Id. § 39-17-1307(c)(1) (2018).

- 8 -

Because the trial court found that self-defense was fairly raised by the proof, the State was also required to prove that the Appellant did not act in self-defense. State v. Benson, 600 S.W.3d 896, 903 (Tenn. 2020). The applicable statute provides:

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2) (2017). If the State has produced clear and convincing evidence that the defendant was engaged in an unlawful activity, the trial court must instruct the jury that the defendant had a duty to retreat before using deadly force. State v. Perrier, 536 S.W.3d 388, 403 (Tenn. 2017). The jury, as the trier of fact, then determines whether the defendant acted in self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). It is therefore within the jury's prerogative to reject a claim of self-defense. Id.

The evidence is sufficient to support the Appellant's convictions because a rational jury could have rejected the Appellant's self-defense claim. Viewed in the light most favorable to the State, the evidence established that the Appellant's belief that he was in imminent danger of serious bodily injury or death was not reasonable. Though the Appellant testified that he was being hit in the face when he began firing, the mother testified that there was a lapse in time between Eric's punching the Appellant and the Appellant's use of deadly force. The mother said that after Eric punched the Appellant, Eric ran away, and the Appellant drove away. The Appellant returned three or four minutes later and began firing toward the home. S.A. also testified that the Appellant left after the initial argument and returned shortly before she heard the gunshots. Therefore, the Appellant, despite having escaped to safety, returned and opened fire. Even in the Appellant's version of events where he fired the shots while being hit, he agreed that his attackers began to run away when he grabbed the gun. Though he claimed that someone returned fire after he began shooting, this claim is not supported by the proof and, nonetheless, he did not claim to have seen or been threatened with a weapon prior to resorting to deadly force. He testified that he fired the shots in response to "constantly

getting hit." Based on these facts, a rational jury could have rejected the Appellant's self-defense claim.

A rational jury could also have rejected the Appellant's self-defense claim based on the Appellant's failure to retreat before using deadly force. Possessing a handgun as a convicted felon is an unlawful activity. Perrier, 536 S.W.3d at 404. The parties stipulated that the Appellant had been previously convicted of a felony, and the Appellant admitted to possessing a handgun. The trial court, therefore, instructed the jury that the Appellant had a duty to retreat before using deadly force. Viewed in the light most favorable to the State, the evidence shows that the Appellant used deadly force when he could have safely retreated from the scene. Accordingly, the Appellant is not entitled to relief.

**II. Sentencing.** The Appellant argues that the trial court abused its discretion by imposing the maximum within-range sentences and ordering that he serve them consecutively. The State argues, and we agree, that the trial court acted within its discretion.

**A. Length of Sentences.** The Appellant first contends that his sentence does not reflect a proper application of the purposes and principles of the Sentencing Act because it "was based primarily on the charges [the Appellant] was found not guilty of committing." In support of this contention, the Appellant points to ten times the trial court expressed that: (1) the Appellant was guilty of an acquitted offense; (2) the jury gave the Appellant a "gift"; or (3) the State improperly indicted the Appellant. Though the State outlined the law that governs a trial court's sentencing determination, it failed to respond to the Appellant's argument.

This court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). The appealing party bears the burden of establishing that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sent'g Comm'n Cmts. The trial court must consider the following when determining the appropriate sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Id. § 40-35-210(b). The principles of sentencing require that the court impose "a sentence justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1). The court must also consider the defendant's potential for rehabilitation or treatment. Id. § 40-35-102(3)(C), -103(5). The sentence must be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

This court has previously concluded that a "trial court's strong reliance on his personal disagreement with the jury's verdict [is] not consistent with the purposes and principles of our Sentencing Act" and therefore is not entitled to a presumption of reasonableness. State v. Gibson, No. W2013-02015-CCA-R3-CD, 2014 WL 4100158, at *13 (Tenn. Crim. App. Aug. 19, 2014), perm. app. denied (Tenn. Dec. 18, 2014). In Gibson, the trial court imposed the maximum within-range sentence after stating that the defendant was guilty of the greater offense of first degree murder, and that "the jury gave him one heck of a break by finding him guilty of murder second degree." Id. at *11-12. This court refused to presume the sentence was reasonable because the trial court's remarks made clear it was improperly seeking to increase the severity of the jury's verdict through sentencing. Id. at *12-13. Nevertheless, this court found that the trial court did not abuse its discretion because the record supported its application of five enhancement factors. Id. at *13.

The trial court's sentencing determination in this case is not entitled to a presumption of reasonableness because of its strong reliance on its personal disagreement with the jury's verdict. Id. The court repeatedly said the Appellant was guilty of first or second degree murder rather than voluntary manslaughter, the verdict returned by the jury, and attempted first degree murder, of which he was acquitted. The court expressed that the jury gave the Appellant "a tremendous gift" and it was "trying to reconcile" what the court believed to be an inexplicable verdict. The court also criticized the State's

- 11 -

indictment, stating that if the State indicted the firearm possession offense properly the Appellant would have been facing a more severe sentence. Like Gibson, these remarks indicate that the court was improperly seeking to increase the severity of the jury's verdict through sentencing. Id. Accordingly, we will not presume that the Appellant's sentence is reasonable.

Nonetheless, we cannot conclude that the trial court abused its discretion by imposing the maximum within-range sentences for each of the Appellant's convictions. The Appellant has not satisfied his burden of establishing that his sentence is improper. He complains only of the trial court's improper reliance on his disagreement with the jury's verdict. This improper reliance removes the presumption of reasonableness, but it does not alone establish an abuse of discretion. See Gibson, 2014 WL 4100158 at *12-13. The trial court also relied on seven enhancement factors, the applicability of which the Appellant has not challenged. The Appellant is therefore not entitled to relief. See id.

**B. Consecutive Sentences**. The Appellant next contends that the trial court failed to make the requisite findings before imposing consecutive sentencing based on the dangerous offender classification. The State responds that the trial court's implied findings were sufficient.

The abuse of discretion standard of review, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations so long as the trial court provided adequate reasons on the record. State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013). Without adequate reasons, however, this court "should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority." Id. at 863-64. Instead, this court "has two options: (1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." Id. at 864.

When a defendant is convicted of more than one offense, the trial court may order consecutive sentences if the court finds, by a preponderance of the evidence, that the defendant fits into at least one of the enumerated categories. Tenn. Code Ann. § 40-35-115(b). In this case, the trial court imposed consecutive sentences based on its finding that the Appellant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See id. § 40-35-115(b)(4). Because the dangerous offender classification is "the most subjective to apply," the trial court must make two additional findings before ordering consecutive sentences based on this classification. Pollard, 432 S.W.3d at 863 (citing State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)). The trial court must find that the aggregate sentence is "'reasonably related to the severity of the offenses'" and "'necessary in order

to protect the public from further criminal acts.'" Id. (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)). Without such findings, the trial court has failed to provide adequate reasons on the record to support the imposition of consecutive sentences. Id.

The trial court in this case failed to make the additional required findings before imposing consecutive sentences based on the dangerous offender classification. We disagree with the State's contention that the court's implied findings were sufficient. Though the court discussed the dangerous nature of the instant offenses, "'[e]very offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences.'" See Pollard, 432 S.W.3d at 863 (quoting Wilkerson, 905 S.W.2d at 938). Because the court failed to provide adequate reasons on the record, we cannot presume that the consecutive sentences are reasonable, nor defer to the court's exercise of discretion. The record, however, is sufficient to conduct a de novo review of the consecutive sentencing determination.

After a de novo review, we conclude that the effective twenty-seven year sentence is reasonably related to the severity of the offenses. The Appellant, using a handgun he was prohibited from possessing, fired at least eight shots toward the home where his children and their mother lived. He struck two individuals, killing one of them. The Appellant's three children were also inside of the home when the Appellant began firing. He fled the scene without rendering aid and discarded his handgun.

We also conclude that the sentence is necessary to protect the public from further criminal acts. The Appellant has five prior felony convictions, one of which resulted in "severe trauma to [the] head area of [the] victim," and eight prior misdemeanor convictions. Despite being a convicted felon, he kept a handgun in his truck. An argument and a punch provoked the Appellant to retrieve that gun and fire at least eight shots, knowing that his children and their mother were inside of the home. The record therefore supports the need to protect the public from further criminal acts of the Appellant. Accordingly, there is an adequate basis for imposing consecutive sentences.

## **CONCLUSION**

For the above reasons, we affirm the judgments of the trial court.


_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE